

**SO ORDERED.**

**SIGNED this 06 day of March, 2007.**

**A. Thomas Small**
**United States Bankruptcy Judge**

---

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

IN RE:                                           CASE NO.

TELEPHIUS LETOINNE PRICE                         06-00957-5-ATS
SHAWANA DENISE PRICE

    DEBTORS

### ORDER REGARDING OBJECTION TO CONFIRMATION

The matter before the court is the objection filed by Wells Fargo Financial Acceptance ("Wells Fargo") to confirmation of the plan proposed by the chapter 13 debtors, Telephius Letoinne Price and Shawana Denise Price.  The issue before the court is whether the unnumbered paragraph immediately following 11 U.S.C. § 1325(a)(9) (sometimes referred to as the "hanging paragraph") precludes the debtors from bifurcating Wells Fargo's secured claim.  A hearing was held in Raleigh, North Carolina on January 16, 2007.

The debtors filed their petition for relief under chapter 13 of the Bankruptcy Code on June 29, 2006.  Wells Fargo filed a proof of claim in the amount of $18,332.37, which is secured by the debtors'

automobile, a 2001 Lincoln LS.  The debtors' plan, which states that Wells Fargo's claim is for $17,869.05, proposes to "strip down" the claim to $12,475.00, which is the value of the automobile, and to give Wells Fargo an unsecured claim for the balance.  Wells Fargo maintains that its claim is a purchase money security interest obtained within 910 days preceding bankruptcy, and that pursuant to the "hanging paragraph" of § 1325(a), its secured claim may not be bifurcated.

The debtors disagree, contending that Wells Fargo does not have a purchase money security interest because the amount of its claim includes obligations separate from, and in addition to, the purchase price of the vehicle.  Specifically, the debtors contend that the installment contract that is the basis of Wells Fargo's claim includes sums advanced to purchase "gap insurance" and to pay the balance owed against the vehicle the debtors traded-in in connection with the purchase of the Lincoln LS.  Wells Fargo agrees that the claim includes these amounts, but the parties disagree as to the significance of their inclusion.

## Background Facts

On July 16, 2005, the debtors purchased the 2001 Lincoln LS from Capital Mazda of Cary and financed the purchase pursuant to terms set forth in an installment sales contract that was subsequently assigned to Wells Fargo.  The contract states that the purchase price of the vehicle was $14,437.17, and that the debtors made a cash down payment

2

of $1,400 and traded in a 1997 Nissan Maxima.  The trade-in allowance given to the debtors by Capital Mazda for the Maxima was $2,861, which was $2,837.96 less than what the debtors owed against that vehicle.  Additionally, the debtors incurred standard fees and taxes of $426 and purchased "gap insurance" at a cost of $600.

The total amount financed under the installment sales contract was $16,901.13.  This includes the purchase price of $14,437.17, "negative trade-in equity" of $2,837.96, $600 for the cost of gap insurance, and $426 for standard fees and taxes, minus the debtor's $1,400 cash down payment.  The balance of $16,901.13 was to be secured by the 2001 Lincoln LS and, according to the terms of the installment sales contract, was to be paid with interest at an annual percentage rate of 19.65% in 72 monthly installments of $401.40.  As of the date of the petition, the net payoff, according to Wells Fargo's proof of claim, was $18,332.37 plus interest.  The debtors contend that the payoff as of the petition date is only $17,869.05, but the debtors have not filed an objection to the claim.

The debtors' chapter 13 plan proposes to bifurcate Wells Fargo's claim into two claims: a secured claim to the extent of the value of the vehicle, which the debtors assert is $12,475.00, and an unsecured claim for the balance.  Wells Fargo maintains that it has a purchase money security interest acquired within 910 days preceding bankruptcy in the amount of $18,332.87, and that pursuant to the hanging paragraph

3

of § 1325(a), its fully secured claim may not be bifurcated because the hanging paragraph makes the "strip down" provisions of § 506 inapplicable.

The "hanging paragraph" in § 1325(a) provides that

For purposes of paragraph (5)[of section 1325(a)], section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [period] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a)("hanging paragraph")(the word "period" after "910-day" was apparently unintentionally omitted from the statute).

Many courts have struggled to discern the meaning of portions of the "hanging paragraph." See, e.g., In re Trejos, 352 B.R. 249, 253-54 n.6 (Bankr. D. Nev. 2006). It is not a simple undertaking, and the problem is that the unnumbered paragraph is subject to several reasonable but conflicting interpretations. It is the court's "duty to make sense of the statute to the extent that is possible, and to give it an interpretation consistent at least with its semantic sense, if not consistent with some well-articulated purpose." Trejos, 352 B.R. at 259.

The debtors concede that the debt was incurred in the relevant 910-day period and that the collateral is a vehicle acquired for

4

personal use.  But, the debtors contend that Wells Fargo does not have a purchase money security interest.  Alternatively, the debtors argue that if Wells Fargo does have a purchase money security interest, its purchase money security interest is for less than the full amount of its claim ($18,322.37), and the hanging paragraph does not prohibit strip down.

## Issues

There are several questions that must be answered before the court can rule on Wells Fargo's objection to confirmation of the debtors' plan.  The most obvious is, does Wells Fargo have a purchase money security interest for the full amount of its $18,322.37 secured claim?  If not, does Wells Fargo, through application of a "dual status" rule, have a purchase money security interest for less than the full amount of its claim?  Before deciding the second issue, however, the court must decide whether the prohibition against "strip down" in the "hanging paragraph" even applies if the purchase money security interest is less than the full amount of the claim.  If it does not apply, the debtors may strip down Wells Fargo's claim whether or not it is determined that Wells Fargo, pursuant to the "dual status" rule, has a purchase money security interest in some lesser amount.

Before addressing these issues it may be helpful to define the unofficial, yet commonly used, bankruptcy terms "cramdown" and "strip

5

down" as they apply in chapter 13 cases, and to review the procedural history that has brought these issues before the court.

### Modification, "Cramdown," and "Strip Down"

Section 1322 provides that a chapter 13 plan may modify the rights of holders of secured claims.  Some of the ways that a secured claim may be modified include reducing the contract interest rate, reworking the payment terms of the obligation, and "stripping down" the amount of the secured claim to the value of the collateral.  Modifications to a secured claim may be accomplished through a plan without the consent of the holder of the secured claim as long as the requirements of § 1325(a)(5) are met.  Modification pursuant to § 1325(a)(5) is known as "cramdown," and § 1325(a)(5) is known as the chapter 13 cramdown provision.

"Strip down" (bifurcation) of a secured claim is authorized by § 506(a), which provides that a secured claim "is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property." 11 U.S.C. § 506(a)(1).  A stripped down claim is bifurcated into two claims: one that is a secured claim equal to the value of the collateral, and a second claim that is unsecured for the balance.  The strip down of a secured claim in a chapter 13 case can be accomplished in several ways.  A debtor or other party in interest may initiate a separate proceeding to determine the value of the collateral pursuant to Rule 3012 of the Federal Rules of Bankruptcy

6

Procedure.  A debtor may also propose a strip down as part of the debtor's chapter 13 plan and, if there is an objection, the court may hold a hearing to determine the value of the collateral in connection with the confirmation hearing.  11 U.S.C. § 506(a)(1).

There are a number of limitations on a chapter 13 debtor's ability to modify a secured claim.  Section 1322(b)(2) provides that "a claim secured only by a security interest in real property that is the debtor's principal residence" may not be modified.  The United States Supreme Court has held that the limitation in § 1322(b)(2) prohibits the bifurcation, or strip down, in a chapter 13 case of a secured claim that is a claim secured only by a security interest in real property that is the debtor's principal residence.  <u>Nobleman v. Am. Sav. Bank (In re Nobleman)</u>, 508 U.S. 324, 332, 113 S. Ct. 2106, 2111 (1993).

Section 1325(a)(5) (the chapter 13 cramdown provision) contains several limitations to modification of secured claims, including several added by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23, that affect strip down.  Section 1325(a)(5) provides:

> (a) Except as provided in subsection (b), the court shall confirm a plan if--
>
>                         * * *
>
> (5) with respect to each allowed secured claim provided for by the plan--
>
>     (A) the holder of such claim has accepted the plan;
>
>     (B)(i) *the plan provides that--*

>> *(I) the holder of such claim retain the lien securing such claim until the earlier of--*
>>
>>> *(aa) the payment of the underlying debt determined under nonbankruptcy law; or*
>>>
>>> *(bb) discharge under section 1328; and*
>>
>> *(II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law; and*
>
> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; *and*
>
> *(iii) if--*
>
>> *(I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and*
>>
>> *(II) the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or*
>
> (C) the debtor surrenders the property securing such claim to such holder[.]

11 U.S.C. § 1325(a)(5) (2005) (italics indicate language added by BAPCPA).

The changes made to § 1325(a)(5) by BAPCPA are not at issue before the court and those changes will not be discussed. The "hanging paragraph" was added to § 1325(a) by BAPCPA, and that unnumbered paragraph's effect on strip down is the issue before the court for consideration.

## Chapter 13 "Strip Down" Procedure

The United States Court of Appeals for the Fourth Circuit has addressed the strip down of claims in chapter 13 on several occasions, and it is clear that to accomplish strip down of a claim through a chapter 13 plan, the secured creditor must be given both adequate notice of the debtor's intention to strip down the claim and an opportunity to challenge that treatment. See In re Linkous, 990 F.2d 160 (4th Cir. 1993) (notice must comport with due process requirements); Cen-Pen Corp. v. Hanson, 58 F.3d 89 (4th Cir. 1995) (discussing notice requirements in context of lien avoidance); see also In re Deutchman, 192 F.3d 457 (4th Cir. 1999). The most commonly used procedure to accomplish strip down in a chapter 13 case in this district is for the debtor to propose bifurcation of the secured claim in the debtor's plan. The chapter 13 trustee then reviews the plan, and if the plan is acceptable, the trustee files a motion to confirm it. The trustee's motion, which clearly identifies the treatment (including any proposed strip down) of all secured claims, is sent to all creditors, and creditors have an opportunity to file objections to confirmation. That is the procedure that was followed in this case, and it is Wells Fargo's objection to confirmation that is before the court.

The first determination that the court must make is whether Wells Fargo has a purchase money security interest securing the full amount

9

($18,322.37) of its secured claim.  The debtor contends that because the security interest contains debt unrelated to the purchase price, Wells Fargo has no purchase money security interest at all.

### Purchase Money Security Interest

The term "purchase money security interest" used in the hanging paragraph of § 1325(a) is not defined by the Bankruptcy Code, but as the court has previously observed, it is a term that is familiar to consumer transactions.  <u>In re Donald</u>, 343 B.R. 524, 536 (Bankr. E.D.N.C. 2006).  To ascertain the meaning of the term bankruptcy courts have looked to state law, and in this case the court will rely on the Uniform Commercial Code as adopted in the state of North Carolina.

North Carolina General Statute § 25-9-103(b)(1) provides that a "security interest in goods is a purchase-money security interest . . . to the extent that the goods are purchase-money collateral with respect to that security interest."  North Carolina General Statute § 25-9-103(a)(1) defines "purchase-money collateral" as goods that secure "a purchase-money obligation incurred with respect to that collateral," and North Carolina General Statute § 25-9-103(a)(2) defines "purchase money obligation" as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."

The Official Comments that relate to these definitions provide
helpful guidance as to what types of obligations are included. The
Official Comment to § 25-9-103(a) provides:

> 3. "Purchase-Money Collateral"; "Purchase-Money Obligation";
> Purchase-Money Security Interest." Subsection (a) defines
> "purchase-money collateral" and "purchase-money obligation."
> These terms are essential to the description of what
> constitutes a purchase-money security interest under
> subsection (b).  As used in subsection (a)(2), the
> definition of "purchase-money obligation," the "price" of
> collateral or the "value given to enable" includes
> obligations for expenses incurred in connection with
> acquiring rights in the collateral, sales taxes, duties,
> finance charges, interest, freight charges, costs of storage
> in transit, demurrage, administrative charges, expenses of
> collection and enforcement, attorney's fees, and other
> similar obligations.
>
> The concept of "purchase-money security interest"
> requires a close nexus between the acquisition of collateral
> and the secured obligation.  Thus, a security interest does
> not qualify as a purchase-money security interest if a
> debtor acquires property on unsecured credit and
> subsequently creates the security interest to secure the
> purchase price.

N.C. Gen. Stat. § 25-9-103 (2005) (Official Comment 3).

The debtors contend that neither the money advanced to pay the
cost of gap insurance nor the amount advanced to fund the negative
equity related to the vehicle that was traded-in come within the
definition of "purchase money obligation," and thus cannot give rise to
a purchase money security interest.  The court agrees with the debtors.

"Gap insurance," as described at the hearing by Wells Fargo, is
insurance that protects the debtor and, indirectly, the secured
creditor.  Gap insurance covers that part of the damage that exceeds

11

the value of the automobile, up to the outstanding balance of the
secured loan.  It is neither mandatory, a component of the loan
agreement, nor a value-enhancing add-on, and thus is dissimilar to the
examples listed in the Official Comment to the North Carolina statute
defining a purchase money security interest.  The court finds that gap
insurance is not part of the purchase price of the collateral.  See In
re White, 352 B.R. 633, 639 (Bankr. E.D. La. 2006)("gap insurance" not
part of purchase price because contract is separate asset, independent
of vehicle purchase, and cost is paid to third party separate from
seller).

The court also finds that funds advanced to pay off the balance
of the debt owed on the vehicle that was traded-in are not part of the
purchase price.  The funds loaned to satisfy the negative equity are
"not a component of the price of the collateral or the value given to
enable the debtor to acquire rights in the collateral," and are
significantly and qualitatively different from the fees, freight
charges, storage costs, taxes, and similar expenses that are typically
part of an automobile sale. Wells Fargo argues that the funds advanced
to pay the negative equity essentially "enabled" the debtors to
purchase the vehicle and should be counted as part of the purchase
price.  The court disagrees, as did the court in In re Peaslee, -- B.R.
--, 2006 WL 3759476 (Bankr. W.D.N.Y. 2006).

> Providing a loan to refinance negative equity on a trade-in,
> which may be a convenient but unnecessary option for a

12

consumer purchasing a replacement vehicle, is not value given to "enable" that consumer to acquire rights in or the use of the replacement collateral. The term "enable" refers to what it has always referred to, which is the value given to allow the debtor to pay, in whole or in part, the actual price of a new item of collateral being acquired, in these cases the replacement vehicles themselves.

Providing a loan to allow a debtor to pay off the lien on a trade-in to the extent that there is negative equity, and then rolling-in and refinancing that loan in the replacement vehicle acquisition transaction, is not value used to acquire rights in or the use of the replacement vehicle collateral and in fact so used, within the meaning of [New York UCC] Section 9-103(a)(2). That portion of the loan provided is in fact used to pay off the lien on the trade-in vehicle.

\* \* \*

In the Peaslee Case and in the other cases in question, there are simply two separate financial transactions memorialized on a single retail installment contract document for the convenience of some consumers and to allow the auto industry to sell more vehicles, which is good for both parties. However, the debt incurred in the separate optional transaction where negative equity is refinanced as a part of the combined transaction does not result in a purchase money obligation and the resulting security interest taken for that debt is not a purchase money security interest.

Peaslee, 2006 WL 3759476 at *9 (footnote omitted); but see In re Graupner, -- B.R. --, 2006 WL 3759457 (Bankr. M.D. Ga. 2006) (notwithstanding "the seemingly obvious conclusion" that the creditor "does not hold a purchase money security interest," the court, by reading the Georgia version of the Uniform Commercial Code together with Georgia's Motor Vehicle Sales Finance Act, found that funds

13

advanced to pay negative equity must be included in the purchase price).

Consequently, Wells Fargo does not have a purchase money security interest for the full amount of its claim.

Wells Fargo's alternative argument is that if it does not have a purchase money security interest for the full amount of the debt, it at least has a purchase money security interest, under the "dual status" rule, for that portion of the debt (excluding gap insurance and funds advance to pay the negative equity) that can be attributed to the actual purchase price.

The debtors argue that even if under the dual status rule Wells Fargo has a purchase money security interest in the debtors' vehicle, the limitations on claim bifurcation in the hanging paragraph do not apply because the entire debt ($18,332.37) is not subject to the purchase money security interest. According to the debtors, the hanging paragraph limits strip down if the creditor "has a purchase money security interest securing the debt that is the subject of the claim." 11 U.S.C. § 1325(a)("hanging paragraph"). The debtors maintain that if only *part* of a debt is secured by a purchase money security interest, the limitation does not apply; it applies only when the creditor holds a claim that is entirely secured by a purchase money security interest. To hold otherwise, the debtors reason, would be to

essentially write the words "some portion of the debt" into the statute where they do not now exist.

The debtors' reading of the "hanging paragraph" comports with the statute's plain meaning and is a reasonable interpretation.  It is the interpretation that was reached by the bankruptcy court for the Western District of New York in the <u>Peaslee</u> decision.  The court in that case held that the hanging paragraph "requires that the debt included in the claim must be secured by a purchase money security interest, so that if all of the debt included in the claim is not so secured, the exception provided in the Section is not applicable." <u>Peaslee</u>, 2006 WL 3759476 at *7.  Furthermore, the court stated that the "plain meaning of the statute certainly does not result in an absurd disposition." <u>Peaslee</u>, 2006 WL 3759476 at *7.  The hanging paragraph "addresses the debt included in a secured claim, which in this Court's view must be entirely secured by a purchase money security interest, not just a portion of it." <u>Peaslee</u> , 2006 WL 3759476 at *10.[1]

In addition to being a reasonable interpretation, it is also supported by the rule of statutory construction that where Congress uses different language in different sections of a statute it is

---

[1]Notwithstanding its ruling that the limitation on strip down did not apply, the court in <u>Peaslee</u> proceeded to address the dual status and transformation rules.  Also, the same court in a subsequent case suggested that the dual status/transformation analysis might be appropriate in some circumstances.  <u>In re Jackson</u>, -- B.R. --, 2007 WL 63582 at *2 n.5. (Bankr. W.D.N.Y. 2007).

presumed that the difference is intentional and suggests that the different phrases have different meanings.  This court has found that rule to be helpful in several cases interpreting amendments to the Bankruptcy Code made by BAPCPA.  See, e.g., In re Paschal, 337 B.R. 274 (Bankr. E.D.N.C. 2006); In re Jones, 339 B.R. 360 (Bankr. E.D.N.C. 2006); In re Donald, 343 B.R. 524 (Bankr. E.D.N.C. 2006).

In Paschal the court considered the meaning of Congress' choice of different language to effect termination of the automatic stay under § 362(c)(3)(A), as compared to § 362(c)(4)(A)(i).  Congress described termination of aspects of the automatic stay very differently in the two sections, and the court endeavored to give full effect to Congress' presumably intentional choice of different language, based on the following rationale:

> The Court of Appeals for the Fourth Circuit recently observed that the use of a particular phrase in one statute but not in another "merely highlights the fact that Congress knew how to include such a limitation when it wanted to." [In re Coleman, 426 F.3d 719, 725 (4th Cir. 2005)].  The Coleman court also quoted the Supreme Court's clear directive on this topic: "Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Keene Corp. v. United States, 508 U.S. 200, 208, 113 S. Ct. 2035, 2040, 124 L. Ed. 2d 118 (1993) (internal quotation marks and alterations omitted), quoted in Coleman, 426 F.3d at 725-6.

Paschal, 337 B.R. at 279.

In Jones the court again considered a question under 11 U.S.C. 362(c)(3)(A), and concluded, applying the same line of statutory

16

analysis employed in <u>Paschal</u>, that "the words 'with respect to the debtor' encompass 'actions taken' against the debtor, [and] against property of the debtor, but do not include 'actions taken' against property of the estate." <u>Jones</u>, 339 B.R. at 363.

In <u>Donald</u>, the court in construing § 521(a)(6) held that "[a] plain meaning construction of the term 'claim for the purchase price' indicates a claim for the *full purchase price*." <u>Donald</u>, 343 B.R. at 536.  Further,

> [a] claim for the full purchase price is not the same as a claim for "a purchase-money obligation" or a claim secured by a "purchase-money security interest."  It is also not the same as a claim for "any portion of the purchase price" or a claim "attributable in whole or in part to the purchase price."  Had Congress meant any of these other types of claims, it would have identified them as it has in other sections of the Bankruptcy Code.

<u>Donald</u>, 343 B.R. at 536.

If Congress intended the hanging paragraph to provide for the disparate treatment of a claim that is only partially secured by a purchase money security interest, it could easily have done so as it had in other sections of the Code.  For example, 11 U.S.C. § 521(a)(6) (2006) (the section that the court discussed in <u>Donald</u>) states that an individual debtor in a chapter 7 case may "not retain possession of personal property as to which a creditor has an allowed claim for the purchase price *secured in whole or in part* by an interest in such personal property" unless the debtor complies with the requirements of

17

that statute.  See also 11 U.S.C. § 1326(a)(4) (referring to personal property "securing a claim attributable in whole or in part to the purchase price of such property").

Obviously, the rule that Congress' use of different language in different sections of a statute is presumed to be intentional, thereby suggesting that the different phrases have different meanings, is often helpful, but the rule is not absolute.  It should not be used in all circumstances.  In Paschal, the rule was useful because there was different language in parallel sections enacted at the same time dealing with virtually the same subject.  Paschal, 337 B.R. at 278-79. In Jones, the analysis involved the well-established and well understood terms "debtor," "property of the debtor," and "property of the estate."  Jones, 339 B.R. at 363.  And in Donald, there was different usage that occurred within the same sentence of the statute. Donald, 343 B.R. at 537.

Although one can find these instances in the Bankruptcy Code where this rule of statutory construction provides much-needed illumination, that does not necessarily mean that Congress intended by its inconsistency to preclude the application of a dual status rule where the full amount of the secured claim was not secured by the purchase money security interest.  When factors like those present in Paschal, Jones, and Donald are not present, the disparity in language may well be attributed to an inattention to detail and an indifference to

18

consistency.  One commentator has suggested that the rule should not be applied with respect to sections added by BAPCPA because "such arguments rely on the omnicompetence of congressional drafting, a premise somewhat in doubt after BAPCPA."  David Gray Carlson, Cars and Homes in Chapter 13, 14 Am. Bankr. Inst. L. Rev. 301, 350 (2006).

Wells Fargo argues that the debtors' interpretation of the statute is incorrect and that the debt referred to in the hanging paragraph may be something less than the full amount of the secured claim.  Wells Fargo contends that the hanging paragraph's strip down limitation applies where the court determines under the dual status rule that a secured creditor has a purchase money security interest in an amount less than the full amount secured.  It is not unreasonable to read the hanging paragraph to mean that the debt referred to is less than the full amount of the secured claim.  Unfortunately, the conflict between these two reasonable readings of the statute cannot be resolved by reference to legislative history, because in this instance, the legislative history merely repeats the statute and provides no guidance to the statute's meaning.[2]

_____

[2]For an excellent review of the legislative reform initiative leading to passage of BAPCPA, see Susan Jensen, A Legislative History of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 79 Am. Bankr. L.J. 485 (2005); for a discussion of the events leading to passage of the automobile provisions of BAPCPA, see William C. Whitford, A History of the Automobile Lender Provisions of BAPCPA, 2007 U. Ill. L. Rev. 143 (2007).

"[I]f a plain reading of the statute does not produce a settled meaning, then further examination of the context of the statute is required." <u>Trejos</u>, 352 B.R. at 261.  To understand the meaning of the hanging paragraph it is essential to examine the relationship between the hanging paragraph and the two sections, § 1325 and § 506, to which the hanging paragraph refers.

The court agrees with the bankruptcy court in <u>In re White</u>, which, although analyzing the hanging paragraph in a different context, observed that "the treatment of the purchase money security interest claim is entirely dependent upon the rights provided in § 1325(a)(5)." <u>White</u>, 352 B.R. at 644.  The debt referred to in the hanging paragraph is not necessarily the full amount of the creditor's secured claim, but is the amount of the secured debt dealt with in the chapter 13 plan pursuant to § 1325(a)(5).  This reading of the statue is preferable to that proposed by the debtors because it incorporates and gives effect to both § 1325(a)(5) and § 506.

In this case, the debtors propose to modify Wells Fargo's secured claim under § 1325(a)(5) by stripping down the secured claim under § 506 to the value of Wells Fargo's collateral.  The amount of the secured claim dealt with under § 1325(a)(5) is $12,475, and that is the amount of "the debt that is the subject of the claim" for purposes of the hanging paragraph.  Because  the secured claim addressed by § 1325(a)(5) is less that the amount of the purchase money security

20

interest that Wells Fargo maintains it would have if a dual status analysis is used, the court must decide whether in the circumstances of this case a dual status or transformation approach is appropriate.

### Dual Status or Transformation Rule

When a security interest includes components that relate to the purchase of the collateral and components that do not, the extent of the secured creditor's purchase money security interest is determined by the application of either the dual status or transformation rule. Under the dual status rule the secured lender has a purchase money security interest to the extent that the amount financed relates to the purchase price, but under the transformation rule the secured creditor has no purchase money security interest because the non-purchase money component transforms the entire claim into a non-purchase money security interest.

Under the Uniform Commercial Code as adopted in North Carolina, a dual status rule is generally required if a security interest involves non-consumer goods, but where the collateral is consumer goods, as in the case before the court, the parties agree that it is within the court's discretion to apply either the dual status or transformation rule.  N.C. Gen. Stat. §§ 25-9-103(e), (f), and (h).

Wells Fargo contends that under the dual status rule it should have a purchase money security interest for the purchase price stated in the contract, $14,437.17 plus the standard fees and taxes of $426.

21

The debtors contend that under the transformation rule Wells Fargo should have no purchase money security interest.

Faced with a similar situation in the case of <u>In re Peaslee</u>, the bankruptcy court for the Western District of New York chose the transformation rule because "it would be virtually impossible for the Court to determine either the actual amount of the negative equity or the actual amount of the purchase money obligation, in large part because the trade-in vehicle would in most cases not be available for inspection and valuation."  <u>Peaslee</u>, 2006 WL 3759476 at *10.

Although the sales contract clearly states that the amount of the purchase price is $14,437.17, the true purchase price and the amount of the negative equity would be difficult to compute. As anyone who has purchased an automobile involving the trade-in of another automobile can readily appreciate, the actual purchase price is a mystery.  The true purchase price is affected by the allowance given by the seller for the vehicle being traded-in.  Although a purchase contract may state a purchase price, that price in reality may be a high price because of an unreasonably low amount assigned by the seller to the vehicle being traded-in.  The fact that a customer paid too much for a vehicle may not affect the amount of the creditor's purchase money security interest where the traded-in vehicle is not subject to a lien, but where negative equity is present the secured creditor has the burden of establishing the difference between the purchase price and

22

advances to pay the debt related to the vehicle being traded-in.  The court agrees with the bankruptcy court in <u>Peaslee</u> that that is a virtually impossible task.  It is especially difficult where, as in this case, the vehicle being purchased is a used vehicle.  Not only must the court factor in the value of the vehicle being traded-in and the value of the automobile being sold, it must also ascertain how pre-bankruptcy payments should be allocated to the purchase money and non-purchase money components of the secured debt.

The court agrees with the bankruptcy court in <u>Peaslee</u>, that generally when negative equity is involved, the appropriate rule is the transformation rule.  There may be exceptions to that general rule, but those exceptions will be rare.  The court will employ the transformation rule in this case, and, accordingly, Wells Fargo's claim is not secured by a purchase money security interest in any amount.  Consequently, the limitation against strip down in the hanging paragraph does not apply and the debtors may strip down Wells Fargo's claim to the value of the collateral, $12,475.

Wells Fargo shall have a secured claim in the amount of $12,475 and an unsecured claim for the balance, $5,857.37.  The debtors' proposed "cramdown" and "strip down" of Wells Fargo's secured claim pursuant to § 1325(a)(5) and § 506 is not precluded by the "hanging

paragraph" and Wells Fargo's objection to  confirmation of the debtors'

plan is **DENIED.**

      **SO ORDERED.**

**END OF DOCUMENT**
